**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF EDUCATION OF<br>ANNE ARUNDEL COUNTY,<br><br>Defendant. | ) | No. 1:26-cv-4499 |

# COMPLAINT

The United States of America sues the Board of Education of Anne Arundel County to stop Anne Arundel County Public Schools ("AACPS") from facilitating the secret "transitioning" of children's "gender identity" at school without their parents' knowledge or consent, in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and the Protection of Pupil Rights Amendment ("PPRA"), 20 U.S.C. § 1232h.

AACPS maintains policies that direct staff to solicit and document gender-related information from students without parental knowledge or consent. These policies require staff to facilitate a student's social transition at school, to memorialize that transition in education records, and to obscure or withhold this information from parents. They further authorize staff to restrict or exclude parental involvement based solely on a unilateral claim of a "safety concern"—with no process for parents to rebut that claim—enabling employees to conceal information while acting on it within the school environment. AACPS also reports students' gender-identity information to

the Maryland State Department of Education without giving parents any notice or opportunity to know what information is being shared about their children.

Moreover, AACPS staff applied these policies to student Mary Doe, calling her by a name that didn't match her legal name or sex—*i.e.*, a male name. When AACPS staff disclosed that male name to other parents, it revealed sensitive information about Mary Doe to third parties—the same information the staff had illegally obtained from Mary and then withheld from Mary's own parents. When Mary's parents tried to exercise their rights to their daughter's education records, AACPS staff told them some records required an appointment and others a subpoena.

This conduct violated, and AACPS's policies continue to violate, FERPA's guarantee that parents can see their children's education records, seek correction or deletion of those records, and prevent unauthorized disclosure of identifying information. AACPS's conduct also violated, and its policies continue to violate, PPRA's guarantee that minor students will not be required to submit to any survey, analysis, or evaluation revealing sensitive information in protected categories without prior written parental consent or, at a minimum, that parents will be directly notified and offered an opportunity to opt their children out before a school attempts to gather that sensitive information. The United States asks the Court to declare this scheme unlawful and enjoin it.

In support of its Complaint, the United States further alleges as follows:

**PARTIES**

1. Plaintiff is the United States of America.

2. Defendant Board of Education of Anne Arundel County (the "School Board") is the public body that governs AACPS[1] and is located in Anne Arundel County, Maryland. The School Board is a recipient of federal funds.

[1] The School Board "[m]ay sue and be sued." Md. Code Ann., Educ. § 3-104.

## JURISDICTION AND VENUE

### A. Generally

3. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 because this action arises under federal law and the United States is the Plaintiff.

4. Declaratory and injunctive relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because Defendant resides in Maryland, and the events or omissions giving rise to this claim occurred in this judicial District of Maryland.

6. The United States is authorized to initiate this action under 20 U.S.C. § 1234c(a)(4).

### B. FERPA and PPRA Jurisdiction

7. Defendant School Board is, and at all relevant times has been, a recipient of federal education funds under an applicable program and is thus subject to FERPA and PPRA.

8. The United States' cause of action arises under 20 U.S.C. § 1234c(a)(4), which authorizes the Secretary of Education to "take any . . . action authorized by law with respect to [a] recipient" that has failed to comply with FERPA or PPRA, including an action for declaratory and injunctive relief brought in federal court.

9. On July 22, 2026, the Secretary of Education determined, following review, that AACPS was out of substantial compliance with FERPA's conditions, thereby satisfying the prerequisite to enforcement action set forth in § 1234c(a)(4).

10. On July 29, 2026, the U.S. Department of Justice, Civil Rights Division ("DOJ") notified AACPS and demanded AACPS cease its violation of FERPA.

11. On September 3, 2026, the Secretary of Education determined, following review, that AACPS was out of substantial compliance with PPRA's conditions, thereby satisfying the prerequisite to enforcement action set forth in § 1234c(a)(4).

12. On September 10, 2026, the DOJ notified AACPS and demanded AACPS cease its violation of PPRA.

13. Additionally, the United States has the inherent power to sue to enforce conditions imposed on the recipients of federal grants.

## FACTS

### A. Children, Parents, and Public Schools

14. A child's age is far more than a chronological fact, which generates commonsense conclusions about behavior and perception.[2]

15. Developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.[3]

16. Children generally are less mature and responsible than adults.[4]

17. Children often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.[5]

18. Children are more vulnerable or susceptible to outside pressures than adults.[6]

---

[2] *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982); *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004) (Breyer, J., dissenting).
[3] *Graham v. Florida*, 560 U.S. 48, 68 (2010); *see also J.D.B.*, 564 U.S. at 273 n.5 (citing *Graham*).
[4] *J.D.B.*, 564 U.S. at 272; *Eddings*, 455 U.S. at 115–16.
[5] *J.D.B.*, 564 U.S. at 272; *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality opinion).
[6] *J.D.B.*, 564 U.S. at 272; *Roper v. Simmons*, 543 U.S. 551, 569 (2005).

19. Children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.[7]

20. A reasonable child can feel pressured to submit when a reasonable adult may not.[8]

21. These conclusions apply broadly to children as a class.[9]

22. These conclusions are self-evident to anyone who was a child once.[10]

23. The legal disqualifications placed on children as a class—*e.g.*, limitations on their ability to alienate property, enter a binding contract enforceable against them, and marry without parental consent—exhibit the settled understanding that the differentiating characteristics of youth are universal.[11]

24. A child's parents are the primary protectors of that child's best interests.[12]

25. Parents have primary authority with respect to the upbringing and education of their children.[13]

26. Parents have a right not to be shut out of participation in decisions regarding their children's mental health.[14]

27. Gender dysphoria is a condition that has an important bearing on a child's mental health.[15]

---

[7] *J.D.B.*, 564 U.S. at 272.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 273.
[12] *Mirabelli v. Bonta*, 607 U.S. 492, 496–97 (2026) (per curiam).
[13] *Id.* at 497; *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925).
[14] *Mirabelli*, 607 U.S. at 497.
[15] *Id.*

28. A school district's decision to conceal information from parents and facilitate a degree of "gender transitioning" likely violates parents' fundamental right to direct the upbringing and education of their children.[16]

### B. Parental Rights Under FERPA and PPRA

29. As a condition of federal funding, FERPA governs the rights parents have concerning their children's education records.[17]

30. FERPA broadly defines "education records" as "those records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

31. FERPA excludes only four types of information from the definition of "education records": (i) a teacher's or administrator's personal notes kept solely by their maker; (ii) records created and maintained by a school's law-enforcement unit for law-enforcement purposes; (iii) employment records about individuals who work for but do not attend the institution; and (iv) treatment records for adult or postsecondary students that are created and used exclusively by health professionals in connection with providing medical or psychological care and are accessible only to those treating the student. *Id.* § 1232g(a)(4)(B).

32. None of the four excluded types of information is relevant here.

33. FERPA prohibits a school district from maintaining a policy that denies or effectively prevents a parent of a minor student from exercising the right to inspect and review the student's education records. *Id.* § 1232g(a)(1)(A).

---

[16] *See id.*

[17] When a student turns 18 years old, or enters a postsecondary institution at any age, the rights under FERPA transfer from the parents to the student. 20 U.S.C. § 1232g(d).

34. FERPA requires a school district to provide parents with an opportunity for a hearing to challenge the content of their child's education records to ensure that the records are not inaccurate, misleading, or otherwise in violation of the student's privacy. *Id.* § 1232g(a)(2).

35. FERPA requires a school district to provide parents with an opportunity for the correction or deletion of any information in their child's education records that the parents believe is inaccurate, misleading, or otherwise inappropriate, "and to insert into such records a written explanation of the parents respecting the content of such records." *Id.*

36. FERPA generally prohibits a school district from permitting the release of, releasing, or providing unauthorized persons access to a child's personally identifiable information contained in the child's education records (except directory information, as defined) without the written consent of the child's parents. *Id.* § 1232g(b)(1)–(2).

37. The term "directory information" includes a "student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student." *Id.* § 1232g(a)(5).

38. FERPA requires a school district to effectively inform parents of their rights under FERPA. *Id.* § 1232g(e)

39. A school district must effectively notify parents of their rights to (i) inspect and review their child's education records and (ii) seek amendment of their child's education records that the parent believes to be inaccurate, misleading, or otherwise in violation of the student's privacy rights. 34 C.F.R. § 99.7(a)(2).

40. A school district must effectively notify parents of the procedures for (i) exercising their right to inspect and review education records and (ii) requesting amendment of their child's education records under *Id.* § 99.7(a)(3).

41. A school district may use any means that are reasonably likely to inform parents of their rights under FERPA. *Id.* § 99.7(b).

42. When a child's parents challenge the content of a child's education records on the grounds that the information contained in the education records is inaccurate, misleading, or in violation of the child's privacy rights, a school district must either amend the record or inform the parents of the right to place a statement in the record commenting on the contested information in the record or stating they disagree with the decision of the agency or institution. *Id.* § 99.21.

43. Unless a school district obtains prior written parental consent, PPRA prohibits school districts from requiring minor students to submit to any survey, analysis, or evaluation that reveals sensitive information concerning one or more of the following eight protected areas (collectively, "Protected Categories"):

i. political affiliations or beliefs of the student or the student's parent;

ii. mental or psychological problems of the student or the student's family;

iii. sex behavior or attitudes;

iv. illegal, anti-social, self-incriminating, or demeaning behavior;

v. critical appraisals of other individuals with whom respondents have close family relationships;

vi. legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers;

vii. religious practices, affiliations, or beliefs of the student or student's parent; or

viii. income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program).

20 U.S.C. § 1232h(b).

44. PPRA requires a school district to develop and adopt policies that, "at a minimum," require employees to "directly notify" a child's parents and offer the child's parents an opportunity to opt the child out of participating before the school district administers any survey containing one or more items related to the Protected Categories. *Id.* § 1232h(c).

### C. AACPS Gender Policies

45. Since at least 2019, AACPS has maintained a series of policies governing students who identify as "transgender" or "gender-nonconforming."

46. An AACPS guidance document, titled *Students and Gender Identity: Guidelines for Support*, says school staff "should" use "the name and pronoun that match the student's gender identity" and permits case-by-case staff decisions about whether and when to notify a student's parents about related issues. *Guidelines* at 4.

47. AACPS Policy JQ, titled "Safe and Inclusive Environments for LGBTQ+ Students" and effective June 16, 2021, similarly guarantees students "the right . . . to be addressed by a name and pronoun that correspond to the student's gender identity" and "the right . . . to use school facilities that correspond with the gender identity the student consistently demonstrates." Pol'y JQ at 2.

48. Regulation JQ-RA, effective September 6, 2022, and most recently revised on August 18, 2026, implements Policy JQ.

49. AACPS directs school staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan to accommodate and support the student and

their gender identity, unless there is a genuine safety concern for the student's physical, emotional, or mental health safety as determined by the principal or the principal's designee." Regul. JQ-RA at 2.

50. AACPS directs staff to honor a student's self-identified name and pronouns without regard to the student's official school records, designates "[i]nformation about a student's gender identity" as "confidential medical information," and instructs staff not to disclose that information except where "legally required." Regul. JQ-RA at 2–3.

51. AACPS employees maintain education records that reflect a student's self-identified gender information. Regul. JQ-RA at 2.

52. AACPS employees report this "student gender information" to the Maryland State Department of Education. Regul. JQ-RA at 2.

53. On August 18, 2026, the School Board revised Section D(4) of Regulation JQ-RA.

54. Amended Subsection D(4)(c) now reads as follows:

> The Federal Family Educational Rights and Privacy Act (FERPA) protects the privacy of parents/guardians and students by generally prohibiting schools that receive federal education funding from disclosing personally identifiable information from a student's education records without the parent's/guardian's consent, except in limited circumstances.

55. Amended Subsection D(4)(d) now reads as follows:

> Nothing in this regulation shall be construed to limit or otherwise interfere with parents'/guardians' rights under FERPA, including the right to inspect and review their student's complete education record. Under FERPA, education records generally include all records, files, documents, and other materials maintained by AACPS that contain information directly related to a student. Board of Education of Anne Arundel County Policy JH and Administrative Regulation JH-RA – Student Records – govern student records at AACPS.

56. The School Board made no other changes to Regulation JQ-RA.

57. On August 19, 2026, AACPS Superintendent Mark T. Bedell issued a "Message" to AACPS families about the revised Regulation JQ-RA, which ends with a summary statement:

> As made clear by these amendments, no policy, guideline, or practice may limit or otherwise interfere with parental rights under FERPA, and this includes any information maintained in education records that relates to gender identity, transgender status, sexual orientation, preferred name, or preferred pronouns.

https://perma.cc/UYD7-79QZ.

58. The School Board's amendments to Regulation JQ-RA do not adequately protect parents' rights under FERPA and PPRA.

59. Neither the Guidance Document, Policy JQ, nor Regulation JQ-RA references parents' rights under FERPA to challenge the content of their child's education record or otherwise provides parents any mechanism to request that AACPS correct, delete, or amend a student's education records when the parents believe any content that reflect a student's self-identified gender information is inaccurate, misleading, or otherwise in violation of the student's privacy rights, or to obtain a hearing on such a request.

60. To the contrary, Regulation JQ-RA provides that "[s]elf-identification of a student's gender is sufficient" to "change a student's gender in the official student record," without describing any corresponding process by which a parent may be notified of this change or may challenge, correct, or supplement this change. Regul. JQ-RA at 2.

61. AACPS directs a principal (or the principal's designee) to limit parental involvement in the development and implementation of a "plan to accommodate and support [a] student and [the student's] gender identity" based on a subjective, unilateral determination that there is a "genuine safety concern for the student's physical, emotional, or mental health safety." Regul. JQ-RA at 2.

62. When AACPS employees develop and implement a "plan to accommodate and support [a] student and [the student's] gender identity" without fully involving parents, AACPS

employees necessarily conceal information from parents and facilitate a degree of "gender transitioning."

### D. AACPS Actions and the Doe Family[18]

63. On July 17, 2026, John Doe and Jane Doe each filed a declaration in the related action *Doe et al. v. Bedell et al.*, No. 1:26-cv-02690-RDB (D. Md. filed July 8, 2026). True and correct copies of the Declaration of John Doe ("John Doe Decl.") and the Declaration of Jane Doe ("Jane Doe Decl.") are attached as Exhibits A and B, respectively.

64. John Doe and Jane Doe are the parents of Mary Doe, a female minor who began her senior year at a public high school within AACPS in the fall of 2026.

65. John Doe and Jane Doe are practicing Christians who regularly attend church with their children and have consistently raised their children, including Mary, in their faith.

66. The Does' religious beliefs hold that God created every person male or female, that sex is fixed at conception and cannot be altered, and that referring to a person using pronouns inconsistent with that person's sex is false and harmful.

67. The Does believe that questions concerning a child's gender confusion are matters for families, not schools, to resolve, and that they have both a religious and parental duty to guide Mary's upbringing on these questions.

68. On December 10, 2025, John and Jane Doe received an email from an AACPS staff member concerning a classroom lab experiment. The email referred to Mary using a male name that is not her legal name.

---

[18] "John Doe," "Jane Doe," and "Mary Doe" are pseudonyms, consistent with those used by the Does in their related action, *Doe et al. v. Bedell et al.*, No. 1:26-cv-02690-RDB (D. Md. filed July 8, 2026). *See* First Am. Compl. ¶ 1 n.1, ECF 13.

69. The Does received a second email notifying them that the staff member had attempted to recall the first email, a third email from the staff member substituting Mary's legal name in place of the male name from the first email, and finally a fourth email from the staff member claiming the original had been sent "to the wrong addresses."

70. Because the Does were familiar with Mary's classmates, they recognized that no classmate matched the male name used in the first email.

71. When the Does pressed the staff member for an explanation, the staff member admitted to lying in the emails and disclosed that Mary had asked to be referred to by the male name.

72. The staff member explained that, at the start of the semester, the staff member had individually asked each student for a preferred name and, separately, held one-on-one meetings with students to discuss preferred pronouns—including with Mary—without involving parents in either process, and stated that AACPS policy permitted this practice.

73. When the Does asked for more details about what had been discussed with Mary, the staff member declined to answer and referred the matter to school administration.

74. The Does directed the staff member, and later the school's assistant principal, to refer to Mary only by her legal name and pronouns consistent with her sex, and requested copies of the policy authorizing staff to solicit students' preferred names and pronouns, the format used to do so, and any record of Mary's responses.

75. The assistant principal responded that "law" and AACPS "policy"—specifically Regulation JQ-RA—required staff to honor Mary's stated preference, declined to produce the requested records, and stated that further objections should be directed to AACPS's Central Office.

76. The staff member nonetheless assured the Does that Mary would be referred to only by her legal name going forward. Believing the matter resolved, and with the class concluding in January 2026, the Does did not pursue it further at that time.

77. On May 1, 2026, the Does received an email, sent to all parents of students attending an off-campus field trip, attaching a roster that organized students by chaperone group. Mary's legal name did not appear on the roster; instead, the same male name used in December 2025 appeared alongside the Does' surname.

78. When the Does raised the discrepancy, the staff member first claimed Mary had been omitted by accident and that the male name belonged to an unrelated student who happened to share the Does' surname—an explanation the Does knew to be false, given the incident that occurred in December 2025, the uniqueness of the male name, and their familiarity with Mary's class.

79. When the Does confronted the staff member about these lies, the staff member admitted no such other student existed and that the roster entry in fact referred to Mary.

80. The Does withdrew Mary from the field trip and requested a refund of the field trip's cost.

81. The staff member apologized and agreed to inquire about a refund, but the Does received no further response for two weeks.

82. On May 18, 2026, the Does again wrote to the staff member, renewing their demands that Mary's records reflect only her legal name and that Mary be referred to only by her legal name, and requesting all records concerning Mary's name, pronouns, gender identity, and any related staff communications or documentation.

83. The assistant principal responded by telephone, again citing Regulation JQ-RA, denying the refund, and maintaining that AACPS's conduct was lawful.

84. When the Does pointed out that Regulation JQ-RA calls for staff to work with a student and the student's parents to develop a support plan absent a genuine safety concern—and that no one from AACPS had ever contacted them to do so—the assistant principal responded that this provision did not apply to high-school students, that the conversation would go "around and around," and directed the Does to the assistant superintendent.

85. On May 18, 2026, the Does escalated their request in writing, first to the assistant principal and then to the school principal, reiterating their demands regarding Mary's education records and request for a refund.

86. On May 19, 2026, the principal acknowledged receipt of the Does' email and said that a response would follow within ten school days.

87. Despite the principal's pledge, no school staff member communicated with the Does within the ten-school-day period, so the Does followed up on June 5, 2026.

88. On June 6, 2026, the principal, via email, denied the refund request, confirmed that Regulation JQ-RA required staff to honor Mary's stated preference, and explained that the regulation's reference to "working with parents" meant only that staff could help families navigate conversations—not that parental notice or consent was required.

89. The principal confirmed that Mary's "official student records" had not been changed and continued to reflect her legal name.

90. As to the Does' records request, the principal stated that the Does could schedule an appointment to review Mary's "educational records" under FERPA, but that "internal emails,

personal notes, or other staff communications would require appropriate legal process, including a subpoena where applicable."

91. On information and belief, the principal's position on parental record access and authority reflects AACPS's general practice for responding to requests for education records that touch on a student's "gender identity" and is not limited to the Does' specific requests. *See* Regul. JQ-RA at 2–3.

92. Despite the Does' repeated requests, AACPS continually declined to provide the specific format used by staff to solicit information about Mary (including Mary's preferred name or pronouns), any record or form used to document Mary's responses, and copies of any records reflecting the use of an alternate name in Mary's education records.

93. Without notifying the Does that AACPS employees would survey, analyze, or evaluate students, including Mary, about information contained in one or more of the Protected Categories and either offering an opportunity for the Does to opt Mary out of participating or obtaining the Does' prior written consent, AACPS, as part of an applicable program, administered (or required Mary to submit to) a survey, analysis, or evaluation that revealed information concerning the Protected Categories.

94. AACPS used the information concerning the Protected Categories it illegally obtained from Mary as means to conceal that information from parents and facilitate a degree of "gender transitioning".

95. AACPS failed to correct, delete, or amend Mary's education records to conform to the Does' requests.

96. AACPS failed to inform the Does of their right to a hearing to challenge the content of Mary's education records.

97. AACPS failed to inform the Does of their right to place a statement in Mary's education records commenting on the contested information or stating why they disagree with AACPS's decision not to correct, delete, or amend Mary's education records to conform to the Does' requests.

98. AACPS denied or effectively prevented the Does from exercising their right inspect and review Mary's education records.

## CLAIMS

### COUNT I
### VIOLATION OF 20 U.S.C. § 1232g(b)
### Unauthorized Disclosure of Personally Identifiable Information

99. The United States realleges and incorporates by reference all preceding paragraphs.

100. Under 20 U.S.C. § 1232g(b)(1), no federal education funds may be made available to an educational agency or institution that has a policy or practice of permitting the release of education records, or personally identifiable information contained therein other than directory information, without the written consent of the student's parents, except as specifically enumerated in § 1232g(b)(1)(A)–(L).

101. Under 20 U.S.C. § 1232g(b)(2), no federal education funds may be made available to an educational agency or institution that has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, without the written consent of the student's parents, except as specifically provided in § 1232g(b)(2)(B).

102. On or about May 1, 2026, AACPS distributed a field-trip roster via email to the parents of all students attending the trip.

103. The roster omitted Mary Doe's legal name and instead listed a male name, which was inconsistent with her legal name and sex, alongside the Does' surname.

104. Because the listed male name was inconsistent with Mary's legal name and sex, and appeared alongside the Does' surname, recipients could readily identify Mary as the student to whom the name belongs.

105. The male name was not publicly known; it was derived from information AACPS itself claims is "confidential medical information." *See* Regul. JQ-RA at 3.

106. The appearance of this combination of information on the roster disclosed the existence and substance of confidential, personally identifiable information related to Mary to all email recipients.

107. This disclosure was made without the Does' consent and does not fall within any exception enumerated in § 1232g(b)(1)(A)–(L) or the exception provided at § 1232g(b)(2)(B), in violation of 20 U.S.C. § 1232g(b).

**<u>COUNT II</u>**
**VIOLATION OF 20 U.S.C. § 1232g(b)**
**Unauthorized Disclosure of Personally Identifiable Information**

108. The United States realleges and incorporates by reference all preceding paragraphs.

109. AACPS employees report "student gender information" to the Maryland State Department of Education. *See* Regul. JQ-RA at 2.

110. AACPS permits the release of, releases, or provides access to students' personally identifiable information when it reports "student gender information" to the Maryland State Department of Education.

111. These actions are taken without parental consent and do not fall within any exception enumerated in § 1232g(b)(1)(A)–(L) or the exception provided at § 1232g(b)(2)(B), in violation of 20 U.S.C. § 1232g(b).

## COUNT III
## VIOLATION OF 20 U.S.C. § 1232g(a)(2)
## Denial of Right to Amend or Supplement Contents of a Child's Education Records

112. The United States realleges and incorporates by reference all preceding paragraphs.

113. Under 20 U.S.C. § 1232g(a)(2), no federal education funds may be made available to an educational agency or institution unless it provides parents an opportunity for a hearing to challenge the content of their child's education records on the grounds that the records are inaccurate, misleading, or otherwise in violation of the student's privacy rights.

114. Under 20 U.S.C. § 1232g(a)(2), no federal education funds may be made available to an educational agency or institution unless it provides parents an opportunity to correct, delete, or amend the contents of their child's education records.

115. Pursuant to 34 C.F.R. § 99.21, "[a]n educational agency or institution shall give a parent or eligible student, on request, an opportunity for a hearing to challenge the content of the student's education records on the grounds that the information contained in the education records is inaccurate, misleading, or in violation of the privacy rights of the student."

116. Via telephone, email, and in-person conversation, Jane Doe repeatedly challenged the content of Mary's education records, demanded that Mary's education records reflect only her legal name and sex, and objected to AACPS employees' use of an alternate male name and pronouns in connection with Mary's education records.

117. AACPS failed to provide John Doe or Jane Doe with an opportunity for a hearing to challenge or correct any AACPS record reflecting an alternate male name, male pronouns, or gender-identity designation for Mary.

118. Neither the Guidance Document, Policy JQ, nor Regulation JQ-RA describes any hearing process for parents who disagree with AACPS's decision to maintain records that reflect a student's self-identified "gender information."

119. Notwithstanding the process described in its "Annual notification of FERPA rights," AACPS did not notify the Does of their right to a hearing regarding Jane Doe's repeated request for amendment.

120. To the contrary, AACPS's assistant principal and principal informed the Does that AACPS's use of Mary's self-identified name was required by "law" and "policy," foreclosing any process for the Does to challenge that determination.

121. Because AACPS did not provide an opportunity for a hearing, none of the statutory remedies—*i.e.*, correction, deletion, or amendment of the record or insertion of a parental statement—were available to the Does.

122. AACPS's failure to afford the Does an opportunity for a hearing to challenge and seek correction of AACPS's records concerning Mary's name and gender-identity designation, and its policy and practice of declining to offer such hearings to similarly situated parents, violates 20 U.S.C. § 1232g(a)(2).

**<u>COUNT IV</u>**
**VIOLATION OF 20 U.S.C. § 1232g(a)(2)**
**Denial of Right to Amend or Supplement Contents of a Child's Education Records**

123. The United States realleges and incorporates by reference all preceding paragraphs.

124. AACPS parents have no way of knowing that AACPS maintains education records containing their child's self-identified gender information if, pursuant to Regulation JQ-RA, an AACPS principal (or the principal's designee) conceals information from parents and facilitates a degree of "gender transitioning" based on a subjective, unilateral determination that there is a "genuine safety concern for the student's physical, emotional, or mental health safety."

125. AACPS does not provide parents with a process to challenge a principal's (or the principal's designee's) subjective, unilateral determination that a "genuine safety concern" exists

or the decision to conceal information from parents and facilitate a degree of "gender transitioning."

126. AACPS generates and maintains education records containing "student gender information" that may be concealed from parents and used by AACPS employees to facilitate a degree of "gender transitioning" based on a principal's (or the principal's designee's) subjective, unilateral determination that a "genuine safety concern" exists.

127. When a principal (or the principal's designee) conceals information from parents and facilitates a degree of "gender transitioning" based on a subjective, unilateral determination that a "genuine safety concern" exists, AACPS does not provide affected parents with an opportunity for a hearing to challenge the content of the "student gender information" in a child's education records in order to ensure that the education records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students.

128. When a principal (or the principal's designee) conceals information from parents and facilitates a degree of "gender transitioning" based on a subjective, unilateral determination that a "genuine safety concern" exists, AACPS does not provide affected parents with an opportunity to correct, delete, or amend any inaccurate, misleading, or otherwise inappropriate data related to the "student gender information" in a child's education records.

129. When a principal (or the principal's designee) conceals information from parents and facilitates a degree of "gender transitioning" based on a subjective, unilateral determination that a "genuine safety concern" exists, AACPS does not provide affected parents with an opportunity to insert into their children's education records a written explanation of the parents respecting the "student gender information" in such records.

130. An AACPS principal's (or the principal's designee's) decision to conceal information from parents and facilitate a degree of "gender transitioning" based on a subjective, unilateral determination that there is a "genuine safety concern" harms children by cutting out the child's parents, who are the primary protectors of the child's best interests.

131. AACPS's failure to provide parents with an opportunity for a hearing to challenge and seek correction or deletion of the "student gender information" contained in their children's education records in order to ensure that the education records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading, or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records, violates 20 U.S.C. § 1232g(a)(2).

**COUNT V**
**VIOLATION OF 20 U.S.C. § 1232g(a)(1)(A)**
**Denial or Effective Prevention of the Right to Inspect and Review Education Records**

132. The United States realleges and incorporates by reference all preceding paragraphs.

133. Under 20 U.S.C. § 1232g(a)(1)(A), no federal education funds may be made available to an educational agency or institution that has a policy of denying, or that effectively prevents, parents the right to inspect and review the education records of their children.

134. Via telephone, email, and in-person conversation, Jane Doe repeatedly requested: the format used to solicit Mary's preferred name and pronouns; any record or form documenting Mary's responses; records of what conversations took place with Mary regarding her name, pronouns, or gender identity; and copies of any records reflecting the use of an alternate name in Mary's education records.

135. The records responsive to these requests were not kept in the sole possession of a single staff member and were not used solely as a personal memory aid. The staff member who

initially communicated with the Does forwarded the matter to school administration; the assistant principal and principal each represented that AACPS's central office and legal team had been consulted regarding the Does' requests; and Regulation JQ-RA itself describes gender-identity information as maintained within AACPS's "student information system," to which AACPS restricts access, rather than treating it as outside any institutional record system. Records shared among multiple staff members and administrators, or maintained within an institutional information system, do not fall within the sole-possession exclusion in 20 U.S.C. § 1232g(a)(4)(B)(i).

136. AACPS nonetheless informed the Does that "internal emails, personal notes, or other staff communications would require appropriate legal process, including a subpoena," before AACPS would produce them, while offering an appointment to review a narrow category of records AACPS unilaterally labeled "educational records."

137. By categorically treating internal communications and notes concerning a student's gender identity as outside the scope of inspectable education records—without regard to whether those records in fact meet FERPA's exclusions—and by conditioning their production on a subpoena or other legal process not required by FERPA or its implementing regulations, AACPS denied, or effectively prevented, the Does the right to inspect and review Mary's education records, in violation of 20 U.S.C. § 1232g(a)(1)(A).

## COUNT VI
## VIOLATION OF 20 U.S.C. § 1232g(a)(1)(A)
## Policy of Denying, or Effectively Preventing, Parents' Right to Inspect and Review Education Records

138. The United States realleges and incorporates by reference all preceding paragraphs.

139. Under 20 U.S.C. § 1232g(a)(1)(A), no federal education funds may be made available to an educational agency or institution that has a policy of denying, or that effectively prevents, parents the right to inspect and review the education records of their children.

140. Section 1232g(a)(1)(A) prohibits not only individual denials of a parent's right to inspect and review education records, but also a recipient's maintenance of "a policy of denying, or which effectively prevents," parents generally from exercising that right.

141. Regulation JQ-RA's treatment of gender-identity information as "confidential medical information" subject to restricted system access, together with the ability of a principal (or the principal's designee) to disallow parental involvement based on a subjective, unilateral determination that a "genuine safety concern" exists, constitutes a policy that denies, or effectively prevents, parents of AACPS students from inspecting and reviewing education records relating to their children's gender-identity status, in violation of 20 U.S.C. § 1232g(a)(1)(A).

142. FERPA does not permit the delayed disclosure, omission, or withholding of records based on a generalized concern for a student's "safety."

143. Regulation JQ-RA's standing, discretionary exclusion of parents denies or effectively prevents parents from exercising their right to inspect and review their children's education records, in violation of 20 U.S.C. § 1232g(a)(1)(A).

## **COUNT VII**
## **VIOLATION OF 20 U.S.C. § 1232h(b)**
## **Failure to Obtain Prior Written Parental Consent**

144. The United States realleges and incorporates by reference all preceding paragraphs.

145. Under 20 U.S.C. § 1232h(b), a school district must not require a minor student to submit to any survey, analysis, or evaluation that reveals information concerning Protected Categories without first obtaining written parental consent.

146. Many of the Protected Categories have relevance to AACPS's regulatory directive to "develop an appropriate plan to accommodate and support the student and their gender identity."

147. Pursuant to Regulation JQ-RA, AACPS directs a principal (or the principal's designee) to limit the involvement of a child's parents in the "plan to accommodate and support the student and their gender identity" when the principal (or the principal's designee) determines "there is a genuine safety concern for the student's physical, emotional, or mental health safety."

148. Many of the Protected Categories have relevance to a principal's (or the principal's designee's) decision to limit parental involvement based on a subjective, unilateral determination that there is a "genuine safety concern for the student's physical, emotional, or mental health safety."

149. The process outlined in Regulation JQ-RA necessarily requires AACPS employees to survey, analyze, or evaluate a child in ways that reveal information concerning the Protected Categories. By design, the JQ-RA protocol compels school officials to question a child about the child's perceived "gender identity," emotional and psychological state, relationships with parents, and other matters that implicate categories Congress deemed sufficiently sensitive to require parental control under 20 U.S.C. § 1232h(b).

150. These inquiries directly inform a principal's (or designee's) decision to limit parental involvement based on a subjective, unilateral determination that there is a "genuine safety concern for the student's physical, emotional, or mental health safety."

151. By conditioning access to perceived accommodations or benefits on a child's participation in this evaluative process, AACPS ensures that the surveys, analyses, or evaluations administered pursuant to Regulation JQ-RA carry inherent coercive force. That is, a child who seeks recognition of a "gender identity," or who seeks adjustments to names, pronouns, records,

or other aspects of school life, cannot obtain these accommodations unless she submits to questioning by school officials.

152. A reasonable child would understand that answering the school's evaluative questions is a prerequisite to receiving those perceived accommodations or benefits, making participation required within the meaning of 20 U.S.C. § 1232h(b).

153. These questions are administered in an official setting, by school officials who hold clear authority over the child, and are framed as necessary steps to "develop an appropriate plan to accommodate and support the student and their gender identity" and to determine whether the child's parents may participate in that process.

154. Given a child's vulnerability, limited ability to resist adult authority, and developmental susceptibility to pressure, a reasonable child would understand the questioning as an information-gathering exercise—*i.e.*, a survey, analysis, or evaluation—to which she is required to submit.

155. Despite the inherently coercive nature of this process and the sensitive subject matter it probes, AACPS does not require or obtain written parental consent before administering these surveys, analyses, or evaluations that reveal information concerning the Protected Categories.

156. AACPS failed to obtain, and failed to require its employees to obtain, the Does' written consent before requiring Mary Doe to submit to such questioning.

157. The District knows or should know that implementing Regulation JQ-RA—by subjecting children to a series of official, sensitive questions designed to generate a "plan to accommodate and support the student and their gender identity" and determine the scope of

parental involvement—is coercive in practice and would be perceived by any reasonable child as a compulsory evaluative procedure.

158. AACPS violated 20 U.S.C. § 1232h(b) by failing to obtain prior written consent from the Does.

159. AACPS violates 20 U.S.C. § 1232h(b) by maintaining and implementing Regulation JQ-RA.

**COUNT VIII**
**VIOLATION OF 20 U.S.C. § 1232h(c)(2)**
**Failure to Notify Parents and Offer an Opportunity to Opt Out**

160. The United States realleges and incorporates by reference all preceding paragraphs.

161. Under 20 U.S.C. § 1232h(c)(2), a school district must develop and adopt policies that, "at a minimum," require employees to "directly notify" a child's parents and offer the child's parents an opportunity to opt the child out of participating before the school district administers any survey containing one or more items related to the Protected Categories.

162. AACPS fails to require that parents be notified, and given the opportunity to opt their children out, before it administers surveys that reveal information concerning the Protected Categories.

163. AACPS fails to notify parents before administering surveys that reveal information concerning the Protected Categories.

164. AACPS fails to give parents the opportunity to opt their children out of participating in surveys that reveal information concerning the Protected Categories.

165. Before administering a survey to Mary Doe that revealed information concerning the Protected Categories, the District failed to notify the Does and failed to give them the opportunity to opt Mary out of participating.

166. AACPS violated 20 U.S.C. § 1232h(c)(2) by failing to notify the Does and by failing to offer an opportunity for them to opt Mary out of participating.

167. AACPS violates 20 U.S.C. § 1232h(c)(2) by maintaining and implementing Regulation JQ-RA.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

(a) A declaration that Defendant's rules, policies, practices, and actions violate the conditions of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g;

(b) A declaration that Defendant's rules, policies, practices, and actions violate the conditions of the Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h;

(c) An injunction ordering Defendant, including all of its officers, employees, agents, and anyone working on their behalf, to:

(1) cease enforcement of Regulation JQ-RA or any similar policy, internal guidance, or practice that denies parents their rights under FERPA or PPRA;

(2) provide parents an opportunity for a hearing to challenge the content of their children's education records, in order to ensure that the records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students;

(3) provide parents an opportunity (i) for the correction or deletion of any inaccurate, misleading, or otherwise inappropriate data contained in their children's education records and (ii) to insert into such records a written explanation of the parents respecting the content of such records;

(4) obtain prior written parental consent before requiring a minor student to submit to any survey, analysis, or evaluation that reveals information concerning:

(A) political affiliations or beliefs of the student or the student's parent;

(B) mental or psychological problems of the student or the student's family;

(C) sex behavior or attitudes;

(D) illegal, anti-social, self-incriminating, or demeaning behavior;

(E) critical appraisals of other individuals with whom respondents have close family relationships;

(F) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers;

(G) religious practices, affiliations, or beliefs of the student or student's parent; or

(H) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program);

(5) notify parents directly and offer them an opportunity to opt their children out of participating before administering a survey that reveals information concerning:

(A) political affiliations or beliefs of the student or the student's parent;

(B) mental or psychological problems of the student or the student's family;

(C) sex behavior or attitudes;

(D) illegal, anti-social, self-incriminating, or demeaning behavior;

(E) critical appraisals of other individuals with whom respondents have close family relationships;

(F) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers;

(G) religious practices, affiliations, or beliefs of the student or student's parent; or

(H) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program);

(d) An order providing such further relief as is necessary and appropriate to bring Defendant's policies and practices into compliance with 20 U.S.C. §§ 1232g and 1232h;

(e) An award of any applicable costs and fees to the United States; and

(f) Other additional relief as the interests of justice may require.

DATED: October 27, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JEFFREY MORRISON
Deputy Assistant Attorney General

JOHN P. MERTENS
Acting Chief, Educational Opportunities Section

*/s/ Jordan K. Carpenter*
JORDAN K. CARPENTER (TN No. 035074)
Counsel
LADAWN BURNETT (MO No. 68881)
DEBJANI MAKEN (MS No. 09876)
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: jordan.carpenter2@usdoj.gov

**ATTORNEYS FOR PLAINTIFF**
UNITED STATES OF AMERICA